CHEMLAWN SERVICES CORPORATION, A Corporation of Ohio; CL Licensing Corporation, A Corporation of Delaware

v.

GNC PUMPS, INC. and R. Gary Palmer.

Civ. A. No. H–86–1693.

United States District Court, S.D. Texas, Houston Division.

Jan. 29, 1988.

Thomas W. Flynn, Biebel, French & Nauman, Dayton, Ohio, Stephen H. Cagle, Arnold, White & Durkee, Houston, Tex., for plaintiffs.

Donald H. Fidler, Houston, Tex., for defendants.

DeANDA, Chief Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pending before the Court in the above-referenced cause is Plaintiffs' renewed and opposed motion for a preliminary injunction. Plaintiffs filed this action on April 24, 1986, alleging infringement of two patents, infringement of their trademark in violation of section 43(a) of the Lanham Trade–Mark Act, 15 U.S.C. § 1125(a), and common-law unfair competition by Defendants' manufacture, distribution, and sale of Mag–P spray guns to the gardening industry. Plaintiffs originally moved for a preliminary injunction on the trademark infringement and common-law unfair competition claims on June 4, 1986.

A full evidentiary hearing was then held on October 9, 1986. At its conclusion, the Court orally granted the requested injunction and ordered the parties to submit proposed findings of fact and conclusions of law. Subsequently, on November 14, 1986, at Plaintiffs' request after Defendant GNC Pumps, Inc., allegedly violated the October ruling, the district judge entered a temporary restraining order and simultaneously reiterated that a preliminary injunction had been in effect since the October hearing. Defendants appealed to the Federal Circuit on November 18, 1986. The Court failed to enter written findings of fact and conclusions of law to support its previous orders until February 3, 1987, at which time the district court no longer had jurisdiction over the matter. *Chemlawn Services Corp. v. GNC Pumps, Inc.*, 652 F.Supp. 1382, 2 U.S.P.Q.2d 1416 (S.D.Tex.1987).

On November 20, 1986, GNC moved for a stay of the preliminary injunction, pursuant to Fed.R.App.P. 8(a). The matter was taken under advisement by the district court. On February 5, 1987, GNC again petitioned the Federal Circuit for a stay when relief from the district court no longer seemed practicable. In an unpublished order, dated March 11, 1987, the Fifth Circuit granted the stay in light of Defendants' likelihood of success on appeal due to procedural deficiencies in the handling of the preliminary injunction.

On July 2, 1987, the Federal Circuit reversed and remanded the November ruling and vacated the preliminary injunction on two grounds. First, the district court had failed to issue findings of fact and conclusions of law simultaneously with its order, pursuant to Rule 52(a). Its attempt to cure that error in February 1987 failed for lack of jurisdiction after Defendants' November 18, 1986 appeal. Second, the district court did not provide for a security bond, as mandated by Fed.R.Civ.P. 65(c). The Federal Circuit noted that the incomplete record before it prevented it from ruling on the merits, as the Federal Circuit is permitted to do in unusual cases to promote judicial economy. In particular, the Federal Circuit observed that the Court's findings of fact might no longer be valid in light of changed circumstances and commercial activities permitted when the stay was lifted on the preliminary injunction. The appellate court suggested that Defendants' inventory of spray guns might be exhausted or they might no longer be available for distribution and sale, thereby making the issue moot. As it happens, later materials submitted to this Court indicate that Defendants received an additional 1600 guns after the stay was lifted and have sold most of them. Nevertheless, it is clear why the Fifth Circuit remanded the action for reconsideration.

This case was subsequently transferred to the docket of the undersigned judge. The Court has reviewed the district court's prior extensive and detailed findings of fact and conclusions of law in conjunction with the record and applicable law, with a scrutinizing eye for any factual issues arising as a result of the passage of time.

On October 23, 1987, this Court held a conference with the parties to discuss the matter and ordered both sides to submit

materials citing any changed circumstances arising since the evidentiary hearing a year earlier. The Court stressed that it would not reopen and retry issues already ruled upon by the presiding judge concerning which Defendants have had their day in court with a full and fair opportunity to litigate. Instead, the Court emphasized that it would only consider relevant factual occurrences since the 1986 hearing which bear on the central issue of the likelihood of confusion. At this conference, in an effort to expedite proceedings, Plaintiffs stipulated that there was no "actual confusion" by purchasers between Chemlawn's and Defendants' spray guns, one factor weighed in determining the likelihood of confusion between products. The Court previously had not made a finding on this factor because of the limited number of guns sold by Defendants by the 1986 hearing.

In response to the Court's request for evidence of changed circumstances due to the passage of time, Defendants have improperly raised questions about the accuracy of testimony during the prior hearing; thus their allegations fail to fall within the ambit of this Court's restrictions. Defendants also challenge the determination that the Chemlawn gun is not solely functional. Because functionality is a legal question and because the underlying facts are already before this Court, the Court concluded that an additional evidentiary hearing was unnecessary.

Therefore, in light of Plaintiffs' stipulation that there is no actual confusion and of Defendants' failure to demonstrate any additional factual issues due to changed circumstances since the 1986 hearing, this Court enters the following findings of fact and conclusions of law, essentially adopted, with minor modifications, from those belatedly entered by the then presiding judge. This Court concludes that Plaintiffs' renewed motion for a preliminary injunction should be granted.

## FINDINGS OF FACT

A. Parties To This Action

1. Plaintiff CL Licensing Corporation is a Delaware corporation and the owner of record of the patents made the basis of the instant lawsuit. (Defendants' Exhibits 4, 13, 14).

2. Plaintiff Chemlawn Services Corporation is a corporation of Ohio and the exclusive licensee of the patents in suit with the right to bring suit for infringement in its own name. (Defendants Exhibits 4 and 15).

3. Plaintiff Chemlawn Corporation is a corporation of Ohio, and through its wholly-owned subsidiary, CL Investments Corporation, owner of all stock in Plaintiffs CL Licensing Corporation and Chemlawn Services Corporation. (Defendants' Exhibit No. 4).

4. Defendant GNC is a corporation of Texas having a place of business in Houston, Texas. Admission of Fact.

5. Defendant Palmer is the registered agent of Defendant GNC, its president, principal stockholder and incorporator, and resides in Houston, Texas. Admission of Fact.

B. History—Background

6. Chemlawn was founded in 1969 for the business of providing professional lawn care to homeowners and others. (Testimony of Miller).

7. In performing these services Chemlawn applied various liquid products to lawns utilizing spray guns for the purpose of providing professional lawn care to homeowners and others. (Testimony of Miller).

8. Chemlawn Corporation initially used a homemade spray gun in its lawncare services. However, the homemade gun was replaced by a commercially available spray gun known as the John Bean spray gun. (Testimony of Miller; Plaintiffs' Exhibit No. 1; Defendants' Exhibit No. 3).

9. The John Bean spray gun was used by Chemlawn Corporation for approximately five to six years. Subsequently, the Equipment Research Center of Chemlawn Corporation developed a gun to be used

**1564**

specifically for the spraying of lawns. (Testimony of Miller; Plaintiffs' Exhibit No. 2).

10. After approximately a year and a half, this gun was replaced in 1976 by another spray gun referred to herein as the "Chemlawn Gun" and designed by the Equipment Research Center of Chemlawn Corporation. (Testimony of Miller; Plaintiffs' Exhibit No. 3).

11. The Chemlawn Gun has been used as the primary lawn spray gun of Chemlawn Corporation and its operating subsidiary Chemlawn Services Corporation from the date of its introduction to the present without any appreciable change in exterior configuration. (Testimony of Miller).

12. Following introduction and use of the Chemlawn Gun, Chemlawn Corporation service personnel experienced losses of the Chemlawn Guns from their service trucks. Various competitors of Chemlawn Corporation began requesting that Chemlawn Corporation sell them Chemlawn Guns. Mr. Gene Probasco, Vice–President of Lesco, Inc., suggested to Miller of Chemlawn Services Corporation an arrangement whereby Lesco would market the Chemlawn Gun to competitors of Chemlawn. (Testimony of Miller and Probasco).

13. Lesco, Inc., manufactures and sells equipment, products, and chemicals to the lawn care industry. (Testimony of Miller).

14. In response to the request for Chemlawn Guns, Chemlawn Corporation entered into an oral arrangement in 1978 with Lesco, Inc. Pursuant to the arrangement, Chemlawn Corporation sold Chemlawn Guns to Lesco for resale by Lesco, primarily to competitors of Chemlawn, golf course maintenance personnel and others engaged in lawn and turf care. (Testimony of Miller; Testimony of Probasco).

15. There was not another acceptable lawn spray gun prior to the introduction and use of the Chemlawn Gun by Chemlawn Corporation in 1976. (Testimony of Miller; TR 62, 63).

16. Other existing spray guns, besides the John Bean spray gun, include a metal spray gun made in Taiwan, a No. 46 spray gun made by Spraying Systems Company, a Model JD9–C spray gun marketed by Encap Products Company under the trademark Green Garde, and a variation of Spraying Systems Company No. 46 gun which is equipped with an elongated spraying boom. All of the above, except for the John Bean Spray Gun and the No. 46 gun, are intended for use on trees or shrubs. (Testimony of Miller; Plaintiffs' Exhibit Nos. 1, 4, 5, 6 and 7; Defendants' Exhibit No. 3; TR 66–69).

17. The Chemlawn Gun is distinctive in appearance, when compared to these other spray guns and to its own prototype in a number of ways:

a) It is made of plastic, whereas the others, except for its own earlier gun, are made of metal;

b) The trigger on each of the others is pivoted at the top, while the trigger of the Chemlawn Gun is pivoted at the bottom;

c) The Chemlawn Gun is different in size and shape from the other spray guns;

d) The nozzle on the Chemlawn Gun is different in shape from the nozzles on the other guns, with the exception of the No. 46 Spraying Systems Company gun, which utilizes a CHEMLAWN nozzle. The CHEMLAWN nozzle has a series of longitudinally extending ribs, an enlarged flange at its downstream end, and a dome-shaped section with numerous perforations through which the liquid is ejected from the spray gun;

e) The Chemlawn Gun has a parallelogram formed on the lower left-hand size of its handle, at the point of attachment of the trigger to the handle. No such pattern of screws appears on the other guns.

(Testimony of Miller; Plaintiffs' Exhibits Nos. 1, 2, 3, 4, 5, 6 and 7; Defendants' Exhibit No. 3).

18. When originally introduced by Chemlawn Corporation, the Chemlawn Gun was a Nylon or off-white color. Sometime later the color was changed to solid white, which Chemlawn Corporation, through its Chemlawn Services subsidiary, has contin-

ued to use. (Testimony of Miller; Testimony of Probasco).

19. The natural, Nylon-colored Chemlawn Gun originally used by Chemlawn Corporation carried the notation "Chem–Lawn Corp." in letters and numerals approximately one-sixteenth inch high. (Testimony of Miller; Plaintiffs' Exhibit No. 3).

20. In 1985 Gene Probasco, a Vice President of Lesco, approached Dr. Robert W. Miller, a Vice President of Chemlawn Services, and asked if the Chemlawn Guns that Lesco purchased in the future could be made green in color and carry the name "Lesco" where "Chemlawn Corp." had previously appeared. Probasco explained to Miller that representatives of Lesco believed that competitors of Chemlawn Corporation would be more willing to use the Chemlawn Gun if it was not identical in color to the gun used by Chemlawn Services. Additionally, it was perceived that competitors of Chemlawn Corp. and/or Chemlawn Services would be reluctant to have equipment which could be observed by their customers and which carried the name of their competitor, Chemlawn Corporation. Permission was granted, and the Chemlawn Guns thereafter sold to Lesco were green and carried the Lesco name on their handles. (Testimony of Miller; Testimony of Probasco; Defendants' Exhibit No. 1).

21. Currently, Chemlawn Services, its competitors and golf course maintenance personnel, and others in the Green Industry use Chemlawn Guns in three different colors: natural Nylon, white and green. (Testimony of Miller; Testimony of Probasco).

22. The Chemlawn Gun, regardless of color, is recognized by the Green Industry as the Chemlawn Gun and is referred to by those in the Green Industry as the Chemlawn Gun. When the Chemlawn Gun has been advertised and sold by Lesco, it had been identified as a Chemlawn Gun or patented Chemlawn Gun. (Testimony of Miller; Testimony of Probasco).

23. In approximately 1981 Chemlawn Corporation was approached by FMC Corporation ("FMC") to explore the possibility of FMC's manufacturing tanks and truck beds for Chemlawn Corporation and also for possible production and marketing by FMC of the Chemlawn Gun. Miller, Defendant Palmer and others participated in the negotiations. (Testimony of Miller; Testimony of Palmer).

24. Subsequent to the meetings and in connection therewith, FMC requested that Chemlawn Corporation send FMC the Chemlawn Guns in different colors, particularly in a red that is a standard color of FMC's products. (Testimony of Miller).

25. In response to the request by FMC, Chemlawn Corporation made up Chemlawn Guns in various colors, including pale green, orange, black and red, and sent some of the spray guns to FMC. (Testimony of Miller; Testimony of Palmer).

26. The variously colored guns sent to FMC were never returned to Chemlawn. (Testimony of Miller).

27. After the meetings with FMC, Gene Probasco of Lesco, Inc., discovered the remaining, variously colored Chemlawn Guns which had not been sent to FMC in the office of Dr. Miller. Probasco requested permission from Miller to borrow the Chemlawn Guns for use at Trade Shows as "attention getters." (Testimony of Miller; Testimony of Probasco).

28. Probasco subsequently displayed the variously colored Chemlawn Guns at Trade Shows, where they were recognized as Chemlawn Guns, despite their different colors, including pale green, orange, black and red. The showing of the variously colored Chemlawn guns generated interest in purchasing Chemlawn Guns in different colors among attendees of the show. (Testimony of Miller; Testimony of Probasco).

29. The representatives of Lesco, Inc., foresaw a tremendous inventory problem if Chemlawn Guns were sold in custom colors. Therefore, Lesco, Inc. decided not to offer Chemlawn Guns in different colors. (Testimony of Probasco).

30. The Chemlawn Gun is recognized as such by members of the Green Industry. (Testimony of Miller).

31. Third-party suppliers to the Green Industry, in advertising their products, often display Chemlawn Guns to illustrate the application of their products, and Green Industry Trade Journals picture Chemlawn guns in illustrating articles of interest to the Green Industry. (Testimony of Miller; Testimony of Probasco; Plaintiffs' Exhibits Nos. 10, 11, 12, 13, 14 and 15).

32. While employed by FMC, Defendant Palmer owned a lawn-care business, for which he purchased from FMC Chemlawn Guns which had been shipped to FMC in connection with the negotiations between Chemlawn and FMC. (Testimony of Palmer).

33. Defendant Palmer has lived in Brazil, speaks its language, Portuguese, and has extensive business contacts there. Palmer also has maintained both a business and personal relationship with a Brazilian company known as Aflon. (Testimony of Palmer).

34. Dan Rusu and Defendant Palmer participated in discussions concerning Aflon's manufacturing for the Defendants a plastic spray gun to compete with the Chemlawn Gun. (Testimony of Palmer).

35. At one such meeting between Defendant Palmer and Dan Rusu at Palmer's residence, Palmer told Rusu that the Defendants wanted a plastic lawn care spray gun to compete with the Chemlawn Gun and gave Rusu a Chemlawn Gun which Palmer had used in his lawn care business. Rusu took this Chemlawn Gun back to Brazil. (Testimony of Palmer).

36. It was decided that the Brazilian company, Aflon, would manufacture a spray gun for Defendants that would have some parts interchangeable with those of the Chemlawn Gun. (Testimony of Palmer).

37. Both Defendants and Aflon were concerned about a possible conflict with Chemlawn regarding the Chemlawn Gun. (Testimony of Palmer).

38. Defendants did not seek legal counsel in regard to any of their concerns about the Chemlawn Gun. (Testimony of Palmer).

39. Aflon now manufactures and has supplied to Defendants a plastic lawn spray gun which Defendants advertise as the "Mag–P" spray gun. (Testimony of Palmer; Plaintiffs' Exhibit No. 8).

40. The Mag–P spray gun is red in color and is a similar, if not the same, shade as the red Chemlawn Guns previously supplied to FMC by Chemlawn Corporation and the red Chemlawn Guns displayed by Lesco at Trade Shows. (Testimony of Palmer; Plaintiffs' Exhibit Nos. 8, 9).

41. The Mag–P gun bears, on the lower left-hand side of its handle, the legend, "Made in Brazil by Aflon for GNC," with the letters "GNC" approximately one-eighth inch in height and the remaining letters somewhat smaller. (Plaintiffs' Exhibit No. 8).

42. In comparison with the Chemlawn Gun, the Mag–P gun differs as follows:

(a) The rear end of the barrel of the Mag–P gun is beveled, whereas the rear end of the barrel of the Chemlawn Gun is not; (Testimony of Miller, TR 38)

(b) The barrel of the Mag–P gun is straight with a flange on the end, whereas the barrel of the Chemlawn Gun is straight about half way and then tapers into the nozzle; (Testimony of Miller; TR 37)

(c) The nozzle of the Chemlawn Gun has a bevel on it, whereas the nozzle of the Mag–P gun does not.

(d) The Mag–P nozzle is slightly longer then that of the Chemlawn Gun. (Testimony of Miller; TR 38)

(e) The longitudinally extending ribs on the nozzle on the Mag–P gun increase in height toward the outlet end of the nozzle, while the longitudinally extending ribs of the nozzle of the Chemlawn Gun are of uniform height throughout their length; (Testimony of Miller; TR–38)

(f) The dome-shaped outlet of the Mag–P nozzle is pyramidal in shape, while the dome-shaped outlet of the Chemlawn nozzle is more smoothly curved and larger in diameter; (Testimony of Miller; TR 38) and

(g) The hole patterns in the dome-shaped portions of the Mag–P and Chemlawn Guns are differently arranged. (Testimony of Miller; Testimony of Palmer; Plaintiffs' Exhibit Nos. 3 and 8).

43. Similarities between the Chemlawn Gun and the Mag–P gun include:

a) Both guns are approximately the same size and shape;

b) Both are made of plastic;

c) Both utilize a white, bottom-pivoted trigger;

d) Both triggers have slidable locking mechanisms on their upper ends;

e) Both guns have a removable cover plate on the left-hand side of their handles which are nearly identical in shape, including an upper rectangular portion that projects up into the barrel where it joins the handle and a lower rectangular portion that extends across the base or butt of the handle;

f) The cover plates on both guns are attached to the guns by four screws that are positioned in identical, irregular patterns;

g) The lettering on the lower left-hand portions of the handles of each gun is outlined in a raised rim of parallelogram shape and of nearly identical dimensions;

h) The nozzle on each of the guns has eight longitudinally extending ribs;

i) The downstream ends of the ribs terminate in an outwardly projecting annular flange;

j) Each of the nozzles utilizes a dome-shaped section through which are formed the several outlet openings.

(Testimony of Miller; Plaintiffs' Exhibits Nos. 3 and 8).

44. Plaintiffs have stipulated that there are no instances of actual confusion between Defendants' Mag–P guns and Chemlawn Guns.

45. The Mag–P gun and the Chemlawn Gun are spray guns intended for use by professionals in the lawn care industry or Green Industry and are therefore similar products. (Testimony of Miller; TR 119).

46. The Mag–P gun and the Chemlawn Gun are nearly identical in size and shape and thus are similar in design. (Testimony of Miller; Testimony of Probasco).

47. The Mag–P gun and the Chemlawn Gun are sold through similar outlets. (Testimony of Miller; Testimony of Probasco).

48. The primary purchasers of the Mag–P gun and the Lesco gun are professionals in the lawn-care industry or Green Industry, and there is, therefore, a similarity of purchasers. (Testimony of Miller).

49. The Mag–P Gun and the Chemlawn Gun are advertised through similar media. (Testimony of Miller; Testimony of Probasco; Testimony of Palmer; Plaintiffs' Exhibit No. 9).

50. The Chemlawn Gun has been used by Chemlawn Corporation, Chemlawn Services, and others throughout the lawn-care industry, or the Green Industry, continuously with the same distinctive external configuration for over five years. (Testimony of Miller).

51. The Chemlawn Gun had a distinctive external appearance unlike any other spray gun on the market at the time of its introduction in 1976 and through the ensuing ten-year period until the introduction in 1986 of the Mag–P gun. (Testimony of Miller).

52. Defendants have made no investment in the tooling for the Mag–P gun. (Testimony of Palmer).

53. Since the Federal Circuit stayed Judge Bue's preliminary injunction in March 1986, Defendant GNC Pumps has received approximately 1,600 additional spray guns from Aflon, of which approximately 450 remain in inventory, over and above the 2,000 originally provided by the Brazilian manufacturer.

54. Defendants have alleged no commitments beyond their present purchase orders to buy additional Mag–P guns from their manufacturer and no agreement obligating Defendants to purchase additional guns from the Brazilian manufacturer. (Testimony of Palmer).

55. The Mag–P gun is just one of over twenty items listed in Defendants' catalog, excluding replacement parts for some of these items, and it constitutes, therefore,

only a small part of Defendants' product line.

56. The Chemlawn Gun has a distinctive exterior appearance.

57. Lawn care professionals within the Green Industry have come to associate the external configuration of the Chemlawn Gun with Chemlawn Corporation.

58. While certain features of the Chemlawn gun have functional purposes, such features are not solely functional but also serve to distinguish the appearance of the Chemlawn Gun from other available spray guns.

59. Aside from any functional aspects of any individual elements of the Chemlawn Gun, its overall appearance is distinctive.

60. The fact that Defendants' Mag–P gun is red in color does not serve to distinguish it from the Chemlawn Gun, which has been sold and used in three different colors and displayed at Trade Shows in four additional colors, so that purchasers would very likely believe that the red Mag–P gun is, in fact, a Chemlawn Gun available in another color.

61. With respect to the digits-of-confusion test, seven of the eight digits of confusion applied by the courts of this and other circuits are present here, while the remaining digit has been stipulated by Plaintiffs.

62. The Court finds that there is likelihood of confusion in the instant case.

(a) The first digit of confusion, intent of the Defendants to confuse purchasers about the source of the product, was proven by admissions of Defendant Palmer made during presentation of evidence at the hearing on Plaintiffs' Motion For Preliminary Injunction:

(1) that he was familiar with the Chemlawn Gun, both as a result of his employment of FMC and through use of the Chemlawn Gun in his own lawn-care business;

(2) that he had a Chemlawn Gun in his possession and gave it to a representative of Aflon and advised him that Defendants wanted a plastic spray gun

to compete with the Chemlawn Gun; and

(3) that Defendants decided that their Mag–P gun would have parts interchangeable with parts of the Chemlawn Guns.

Additionally, the similarity between the Mag–P gun and the Chemlawn Gun indicates a conscious effort to copy the Chemlawn Gun as closely as possible. The gun produced by Defendants in concert with Aflon is nearly identical in size and shape to the Chemlawn Gun.

(b) The second digit of confusion, similarity of design, is satisfied by the near identity of the two guns in size and shape.

(c) The third digit of confusion is actual confusion, whose nonexistence is stipulated to by Plaintiffs here.

(d) The fourth digit of confusion, similarity of product, is apparent because both products are professional spray guns used primarily in the professional spray guns used primarily in the professional lawn-care business or Green Industry.

(e) The fifth digit of confusion, also realized here, is that the same types of retail outlets handle both the Chemlawn Gun and the Defendants' gun.

(f) The sixth digit of confusion is similarity of purchasers, here lawn-care professionals or professionals in the Green Industry.

(g) The seventh digit of confusion is similarity of advertising media for the products. In the instant action, the evidence showed that in at least one instance the advertising media have been identical.

(h) As evidence of the eighth digit, the strength of the mark involved, the extensive, exclusive, and continuous use of the same configuration for the Chemlawn Gun for over a decade with little change in exterior appearance other than changes in color has resulted in the Chemlawn Gun's being associated with Chemlawn Corporation throughout the Industry. As such, the configuration of the Chemlawn Gun is a strong indication of origin and a mark of considerable strength.

**CONCLUSIONS OF LAW**

1. The Court has jurisdiction over the parties and the subject matter, pursuant to 28 U.S.C. § 1332, 1338(a) and (b), and 15 U.S.C. § 1121. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400(b).

2. Chemlawn Corporation, Chemlawn Services Corporation, and CL Licensing Corporation are the proper parties to maintain this suit based on Count III of the Complaint in that Chemlawn, through its wholly-owned subsidiary CL Investments Corporation, owns all of the stock in all of the subsidiary Chemlawn corporations. The Court need not determine whether any rights in the configuration of the Chemlawn Gun are in some subsidiary of Chemlawn other than CL Licensing or Chemlawn Services.

3. However, insofar as any transfer of title to rights in the exterior appearance of the Chemlawn Gun was made to a subsidiary during the reorganization of September 1984, such title was transferred to CL Licensing Corporation as part of the transfer to it for "patents, trademarks, licenses and similar intangible property."

**PROPRIETY OF A PRELIMINARY INJUNCTION**

4. A preliminary injunction is an equitable remedy available at the sound discretion of the district court. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

5. The factors to be considered by the trial court are:

(a) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(b) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(c) whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(d) whether the granting of a preliminary injunction will disserve the public interest.

*Roper Corporation v. Litton Systems, Inc.,* 757 F.2d 1266 (Fed.Cir.1985).

6. A preliminary injunction will normally issue only for the purpose of preserving the status quo and protecting the respective rights of the parties pending final disposition of the litigation. *Smith International, Inc. v. Hughes Tool Company,* 718 F.2d 1573 (Fed.Cir.1983).

7. The requirements for obtaining a preliminary injunction in a trademark case are generally the same as the requirements in non-trademark cases. *M. Kramer Manufacturing Co. v. Andrews,* 783 F.2d 421, 448 (4th Cir.1985).

A. *Irreparable Harm*

8. The absence of an available remedy by which the movant can later recover monetary damages may be sufficient to show irreparable injury. *Enterprise Intern. Inc. v. Corporation Estatal Petrolera Ecuatoriana,* 762 F.2d 464 (5th Cir. 1985).

█ 9. Likelihood of confusion due to the subsequent use of the confusingly similar mark by its very nature causes irreparable harm. *Home Savings of America v. Home Savings Ass'n,* 291 U.S.P.Q. 157, 159 (S.D.Tex.1982).

█ 10. A showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm. *Canon U.S.A., Inc. v. Saber Sales Corp.,* 220 U.S.P.Q. 1003, 1006 (E.D.N.Y. 1983). Although actual confusion is the best evidence of likelihood of confusion, it need not be shown to obtain equitable relief where other proof supports Plaintiffs' request. *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695, 704–05 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).

█ 11. Loss of control of the quality of the products, as in the present case, constitutes an irreparable harm to plaintiff. *See American Rice, Inc. v. Arkansas Rice*

*Growers Cooperative Ass'n*, 532 F.Supp., 1376, 1389 (S.D.Tex.1982).

### B. *Likelihood of Success*

■ 12. For a plaintiff to bring an action for trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the use of a confusingly similar trade dress must constitute either a false designation of origin or a false description or representation. *Chevron*, 659 F.2d at 700.

■ 13. The copying by Defendants of the configuration of the Chemlawn Gun constitutes a "false representation" as defined in § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This section reads in pertinent part:

§ 1125. False designations of origin and false descriptions forbidden.

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation or origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any persons doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides a cause of action for trade dress infringement for a party injured by one who sells his goods in such a way as to make it appear that they come from some other source. *Chevron*, 659 F.2d at 700. Plaintiffs may satisfy the jurisdictional requirement of use in interstate commerce pursuant to 15 U.S.C. § 1125(a) by demonstrating:

(1) that the infringing mark, or false designation or misrepresentation, was used in connection with goods in commerce, or

(2) that the Defendants' use, while wholly intrastate, tended to have a substantial effect on the Plaintiffs' business.

*Schroeder v. Lotito*, 577 F.Supp. 708 (D.C. R.I.1983). In the present action, it is undisputed that the Defendants' Mag–P spray gun moves in interstate commerce. (Testimony of Palmer). Moreover, Defendant Palmer acknowledged that the gun is imported into the United States from Brazil and is sold by at least one company, Green Pro, located in New York, and that the Defendants' headquarters, located in Texas, supply the guns to Green Pro.

■ 14. Despite the variety of perspectives and terms of art that courts use in analyzing trademark and trade dress cases, the inquiry should be reduced to two basic questions. The first, whether a mark or dress qualifies for protection, encompasses the issues of distinctiveness, secondary meaning, and functionality. The second, whether the protected mark or dress has been infringed, is answered by applying the "digits-of-confusion" test to decide whether a likelihood of confusion exists. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 (5th Cir.1984).

### (1). *Distinctiveness*

■ 15. In the terminology of trademark law, distinctiveness is the capacity of a mark to distinguish a product or service which emanates from one source, from products or services emanating from other sources. *Callman Unfair Comp., Trademarks & Monopolies*, § 18.01 (4th Ed.).

■ 16. The fact that a particular design feature may also be functional does not prevent that design feature from distinguishing the goods or product. Only such design features as are functional and are dictated solely by utilitarian characteristics are not protected. *Sicilia*, 732 F.2d at 425.

### (2). *Functionality*

■ 17. The functionality standard adapted by the Fifth Circuit focuses on the utilitarian nature of a configuration or design, but a design that merely assists in a product or configuration's utility is not functional and may therefore be protected. *Sicilia*, 732 F.2d at 428–29.

18. The parts of the Chemlawn Gun were obviously designed to perform their particular functions; however, the specific exterior configuration was arbitrarily selected. It was not necessary to copy the configuration of each of the parts of the Chemlawn gun in order to effectuate those functions.

### (3). *Secondary Meaning*

19. The term "secondary meaning" was developed as part of the common law of trademarks. *Chevron*, 659 F.2d at 702.

■ 20. Trademarks may acquire distinctiveness through extensive use by a single supplier so that the public recognizes the trademarks as identifying the source of the product. That kind of consumer identification is termed "secondary meaning." *Chevron*, 659 F.2d at 702.

■ 21. Trademark law requires a demonstration of "secondary meaning" only when the claimed trademark is not sufficiently distinctive in itself to identify the producer. *Chevron*, 659 F.2d at 702. The same principles apply to protection of trade dress, as in the instant action.

22. In the action at bar, the evidence showed that the Chemlawn Gun has been manufactured exclusively by Chemlawn for over a decade. Thus, even if the features on the Chemlawn Gun could not be deemed inherently distinctive in appearance at the time of its introduction into the lawn care industry, the Chemlawn Gun's long and extensive production would serve to identify it to the industry as a product emanating from Chemlawn.

23. In addition, case law holds that proof of deliberate copying of one product by another establishes a *prima facie* case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue. *M. Kramer Manufacturing Co.*, 783 F.2d at 448. In the case *sub judice*, the Defendants failed to present evidence rebutting the presumption on the issue of secondary meaning.

24. The Court finds the continuous manufacture over the past decade by Chemlawn and its subsidiary of the Chemlawn Gun and the intentional copying of it by Defendants caused it to achieve secondary meaning, and thus it is protectible as a trademark under § 43(a) of the Lanham Act.

### (4). *Likelihood of Confusion*

■ 25. The Fifth Circuit has set out a list of factors called "digits of confusion" which must be applied in weighing the relative likelihood of confusion against a lack of confusion. *Chevron*, 659 F.2d at 703; *Sicilia*, 732 F.2d at 430. The "digits" to be examined include Defendants' intentions, the similarity of the respective designs, evidence of actual confusion, the similarity of the products, the similarity of retail outlets, the similarity of purchasers, and the advertising media used. *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 (5th Cir.1984); *Chevron*, 659 F.2d at 703.

26. Courts almost unanimously presume a likelihood of confusion based upon a showing that the defendant intentionally copied the plaintiff's trademark or trade dress. *M. Kramer Manufacturing Co.*, 783 F.2d at 448 n. 24 citing *2 U. McCarthy, Trademarks and Unfair Competition*, §§ 23:24–:35 (2d Ed.1984).

■ 27. The Court finds that the Plaintiffs have shown, through an application of the digits of confusion test adopted by this and other circuits, a likelihood of confusion between Plaintiffs Chemlawn Gun and Defendants' Mag–P Gun. Moreover, pursuant to settled law, the Plaintiffs have also established a likelihood of success on the merits and irreparable harm.

### C. *No Threatened Harm to Defendants*

28. The Court further finds that because Defendants have (1) no interest in the tooling used to produce their Mag–P Gun, (2) no commitment beyond their

**1572**

present purchase orders to buy more of these guns from their manufacturer, (3) only recently added the guns to their production line, and (4) several other products in their product line, there is minimal risk of harm to Defendants from the issuance of an injunction. The balancing of equities favors the Plaintiffs, who would be irreparably harmed if an injunction did not issue.

### D. *Public Interest*

29. The Court finds that the public interest is served by enjoining unfair trade practices which occur within the stream of commerce subject to the lawful regulation of Congress and in violation of the Lanham Act. *American Rice*, 532 F.Supp. at 1389–90.

Based upon these findings of fact and conclusions of law, the Court, pursuant to Fed.R.Civ.P. 65,

ORDERS that Plaintiffs' motion for a preliminary injunction is GRANTED. Furthermore, Plaintiffs shall post as security a surety bond in the amount of $5,000.00 (five thousand dollars) with the Court.