**QUANTUM FITNESS CORPORATION,**
**Plaintiff,**

v.

**QUANTUM LIFESTYLE CENTERS,**
**L.L.C., Defendant.**

**No. CIV.A. H–98–4119.**

United States District Court,
S.D. Texas,
Houston Division.

Aug. 12, 1999.

---

Joe B. House, House & House, Houston, for Quantum Fitness Corporation, A Texas Corporation, plaintiff.

Anthony P. Griffin, Galveston, Terry Lou Weir, Houston, for Quantum LifeStyle Centers, A Texas Limited Liability Company, defendants.

## MEMORANDUM OPINION AND ORDER

ROSENTHAL, District Judge.

Plaintiff Quantum Fitness Corporation ("Quantum Fitness"), a manufacturer and distributor of fitness and exercise equipment, seeks a preliminary injunction against defendant, Quantum LifeStyle Centers, L.L.C. ("Quantum LifeStyle"), a health and fitness club that began doing business in December 1998. Quantum Fitness asks this court to enjoin Quantum LifeStyle from using the word "Quantum" in the name of its club. (Docket Entry No. 3). Quantum Fitness alleges that Quantum LifeStyle's use of the word "Quantum" infringes two protected trademarks and threatens the consumer recognition that Quantum Fitness has achieved in the physical fitness industry.

Based on the pleadings, the application and response, the extensive briefs and submissions, the testimony and exhibits presented at the evidentiary hearing, and the applicable law, this court enters the findings of fact and conclusions of law set out below. Based on these findings and conclusions, this court GRANTS the motion for a preliminary injunction, and sets a hearing date for a permanent injunction.

## FINDINGS OF FACT

### I. The Industry and the Trademarks

In a two-day evidentiary hearing held on March 3 and 4, 1999, this court heard testimony from Brooke Ayton, the president and cofounder of Quantum Fitness; Krista Davis, a sales representative for Quantum Fitness; Paul Croegaert, a sales manager for Quantum Fitness; Kyle Bauer, the owner of Quantum LifeStyle; Michael Heckman, a Quantum LifeStyle employee; Lisa D'Angelo, the general manager for Quantum LifeStyle; and John Ramirez, a fitness specialist with the City of Missouri City Parks and Recreation Department. These witnesses, and the exhibits, described the nature of the plaintiff's and defendant's business; the health and fitness industry in which they operate; the trademarks under which they do business; and the perception of those trademarks.

Quantum Fitness, a corporation based in the Houston, Texas metropolitan area, is "in the business of designing, manufacturing and selling exercise, weight training, and rehabilitation equipment and providing design, selection, maintenance, repair and consulting services with respect to such equipment throughout the United States and the world." (Docket Entry No. 3, p. 6). Most of the equipment that Quantum Fitness designs, manufactures, and sells is for weight training. Quantum Fitness also sells cardiovascular equipment, such as treadmills, stair climbing machines, and other equipment designed for aerobic exercise, that is manufactured by other companies. The equipment often includes exercise programs that Quantum Fitness designs.

Quantum Fitness's customers are primarily commercial entities that operate health and fitness centers, such as health clubs, health spas, hotels, hospitals, schools, apartment buildings, rehabilitation facilities, and corporate health facilities. Direct sales to individuals account for less than ten percent, and closer to five per-

cent, of Quantum Fitness's overall sales. Health and fitness clubs, either independent, such as Quantum LifeStyle, or part of larger entities, such as hotels, schools, or medical centers, make up the main category of Quantum Fitness's direct customers. Members of fitness clubs, such as Quantum LifeStyle, are indirect customers of Quantum Fitness.

The undisputed testimony at the hearing shows that commercial purchasers of exercise equipment are greatly influenced in the choice of equipment by the preferences of their own customers, the individuals who use the equipment in the facilities. Manufacturers routinely provide health clubs and other commercial users with equipment at no cost, on a trial basis, to build demand for the product. (Testimony of Brooke Ayton, Paul Croegaert, and John Ramirez). If a piece of equipment proves popular with the end users, the health club will often purchase it. For this reason, Quantum Fitness directs much of its marketing effort toward the general public, including both potential and actual members of health and fitness clubs.

Quantum Fitness owns federal trademark Registration No. 1,697,788, for the mark "Quantum Fitness," issued by the United States Patent and Trademark Office ("USPTO") on June 30, 1992. (P.Ex. 12).[1] Quantum Fitness also owns federal trademark Registration No. 2,199,842 for the mark "Quantum," issued on October 27, 1998. (P.Ex. 14). Quantum Fitness has used the Quantum Fitness mark in connection with its business continually since 1990. The Quantum Fitness mark, issued in June 1992, is registered for "pin select weight machines and free weight benches, for sale to and use in the commercial market, namely, health clubs, health spas, resort exercise clubs, corporate health facilities, rehabilitation facilities, medical facilities, schools, hotels, mul-

ti-residential buildings and public exercise facilities." (P.Ex. 12). The trademark specifically disclaims "the exclusive right to use 'fitness' apart from the mark as shown." (*Id.*). The Quantum mark, issued in October 1998, is registered for "exercise equipment, namely free weights, benches and exercise machines for use in the commercial market, namely, health clubs, health spas, resort exercise clubs, corporate health facilities, rehabilitation facilities, medical facilities, schools, hotels, multi-residential buildings and public exercise facilities." (P.Ex. 14). Both marks show a first use in commerce of November 1, 1990.

Quantum Fitness's president, Brooke Ayton, testified that Quantum Fitness sells equipment in all fifty states and in a number of other countries. Ayton conservatively estimated that two thousand facilities have Quantum Fitness equipment and that approximately forty thousand people see and use the equipment daily. Quantum Fitness places the "Quantum" or "Quantum Fitness" mark on every piece of exercise equipment that it sells. (P.Ex. 117). Since 1990, Quantum Fitness has spent over one million dollars in advertising Quantum Fitness equipment and programs. Since 1995, Quantum Fitness has spent approximately $700,000 to advertise its products and related services. (Testimony of Brooke Ayton; P. Exs. 82–86). Quantum Fitness has distributed over one hundred thousand promotional brochures in health clubs and fitness facilities nationwide.[2] (Testimony of Brooke Ayton).

Quantum LifeStyle is a limited liability company incorporated in 1995, doing business as QLS QuantumLifeStyle Center. On December 19, 1998, Quantum LifeStyle opened a "holistic" health club under the name QLS QuantumLifeStyle Center in Humble, Texas. In addition to providing cardiovascular and weight training equip-

---

**1.** Plaintiff's and defendants' exhibits from the March 3–4, 1999 preliminary injunction hearing are referred to as "P.Ex. ____" and "D. Ex.____," respectively.

**2.** Quantum Fitness has submitted examples of the brochures they have distributed. (P. Exs. 26–39).

ment to its members, Quantum LifeStyle offers or intends to offer other physical fitness and "wellness" related programs and services. These include aerobics classes, fitness testing, nutritional counseling, personal training, a children's activity center, and a beauty salon. (D.Ex. 2). Quantum LifeStyle spent $300,000 to equip its workout center, but did not purchase any exercise equipment manufactured or sold by Quantum Fitness.

Quantum LifeStyle's facility is close to a number of other gymnasiums and health clubs, including the Cypress Creek YMCA, the Lake Houston YMCA, and the Lake Houston Gym & Fitness club. All these other health clubs are significant clients of Quantum Fitness. Quantum LifeStyle hopes to persuade members of these nearby clubs to switch to Quantum LifeStyle, in addition to recruiting members who have not previously belonged to a fitness club.

Quantum LifeStyle is a direct competitor with health and fitness clubs. The clubs with which Quantum LifeStyle presently competes include purchasers of Quantum Fitness's equipment and services in the Houston, Texas area. The clubs that Quantum LifeStyle intends to open and operate in the future would directly compete with the type of facility that purchases exercise equipment and related services, including that manufactured and sold by Quantum Fitness.

Kyle Bauer is the owner and founder of Quantum LifeStyle. Bauer testified that in 1994, he first began developing a business plan for a national chain of "holistic" health clubs. Bauer hired a design firm, which devised the QLS QuantumLifeStyle Center mark for the club concept. Bauer testified that he did not investigate to determine whether this mark was already in use or registered in the fitness industry; he asserted that Design Force was responsible for investigating the mark. Bauer testified that before he decided on the QLS QuantumLifeStyle Center mark, he had considered using the name "Quantum

Health & Fitness Center," and even had Design Force create a corresponding logo, (P.Ex. 87), but decided to use the "QLS QuantumLifeStyle Center" mark. Bauer testified that he had considered and rejected the idea for a name and mark using the words "Quantum" and "Fitness" together without any prior knowledge of Quantum Fitness's use of the mark for its cardiovascular and weight training equipment and related programs. Bauer testified that he had never heard of Quantum Fitness until August 1998.

Bauer's testimony on his lack of any prior knowledge of the Quantum Fitness mark is simply not credible. Bauer's long involvement in the fitness industry and his testimony as to his research into, and personal knowledge about, fitness training and equipment, make it highly improbable that he would be unaware of the Quantum Fitness line of fitness and training equipment until four years after he began the extensive work of preparing to open his own fitness center.

Quantum LifeStyle first began using the "QLS QuantumLifeStyle Center" mark in commerce in the summer of 1998. In August 1998, a local fitness, health, and sports magazine carried a press release announcing the imminent opening of the Quantum LifeStyle health club. (P.Ex. 91). Quantum LifeStyle began advertising in other local publications in the fall of 1998. (P. Exs.92–95). In these advertisements, the word "Quantum" was set off from the words "Life Style Center" through the use of boldface lettering.

Ayton first learned about Quantum LifeStyle through the press release in the August 1998 magazine. Paul Croegaert, a sales manager for Quantum Fitness, telephoned Bauer to warn him of a potential trademark problem. Bauer testified that Croegaert threatened him with legal difficulties over the trademark unless Bauer purchased Quantum Fitness equipment. Croegaert acknowledged that he asked whether Bauer was interested in purchas-

ing exercise equipment from Quantum Fitness, but vehemently denied that he threatened to pursue trademark litigation if Bauer did not buy the equipment.

Quantum Fitness sent Quantum LifeStyle a letter on September 10, 1998, demanding that Bauer "change his mark to a mark that is not confusingly similar to QUANTUM FITNESS." (P.Ex. 115). Quantum LifeStyle responded on October 1, 1998, denying infringement and affirming its intent to continue to use and register the service mark "QLS QuantumLifeStyle Center." (D.Ex. 21). On November 24, 1998, Quantum LifeStyle applied for federal registration of the "QLS QuantumLifeStyle Center" mark. (P.Ex. 109).

On December 9, 1998, Quantum Fitness brought this trademark infringement suit against Quantum LifeStyle. On December 18, 1998, Quantum Fitness moved for a temporary restraining order and a preliminary injunction. Quantum LifeStyle opened to the public on December 19, 1998. Kyle Bauer testified that Quantum LifeStyle has spent approximately $20,000 on advertisements; does not yet have a permanent exterior sign for the facility; and can alter its graphic design for use on stationery, logo clothing, towels, and similar materials with ease.

After a hearing before this court on December 21, 1998, the parties agreed that pending discovery and an evidentiary hearing on whether a preliminary injunction should issue, Quantum LifeStyle would place a disclaimer of association with Quantum Fitness on any use of the "QLS QuantumLifeStyle Center" mark incorporating the term "Quantum." Quantum LifeStyle also agreed to mail letters disclaiming any connection to Quantum Fitness to anyone who responded to Quantum LifeStyle's previous mailings or solicitations. Finally, Quantum LifeStyle promised that its employees would disclaim any connection to Quantum Fitness in its sales pitches or in response to initial telephone or verbal inquiries from members of the public. (Docket Entry No. 5). The testimony shows that since December 1998, Quantum LifeStyle used "QLS" to identify the facility in its exterior sign, on its logo clothing, and on towels and other logo or insignia items used inside the club. The parties agreed to extend these terms after the hearing, pending the issuance of this court's ruling on Quantum Fitness's motion for a preliminary injunction. (Docket Entry No. 27).

This court now examines whether Quantum Fitness is entitled to a preliminary injunction against Quantum LifeStyle's use of the word "Quantum" in the name of its facility.

## II. The Legal Standards for a Preliminary Injunction

A plaintiff seeking a preliminary injunction must establish: "(1) a substantial likelihood of success on the merits, (2) a substantial threat that failure to grant the injunction will result in irreparable injury, (3) that the threatened injury outweighs any damage that the injunction will cause the opposing party, and (4) that the injunction will not disserve the public interest." *Sierra Club v. City of San Antonio,* 112 F.3d 789, 793 (5th Cir.1997), *cert. denied,* 522 U.S. 1089, 118 S.Ct. 879, 139 L.Ed.2d 868 (1998). This court examines each of these requirements below.

### A. Substantial Likelihood of Success on the Merits

In a trademark infringement claim, the plaintiff must demonstrate "(1) that it has a valid mark that is entitled to protection under the [Lanham] Act, and (2) that use of the defendant's mark infringes, or is likely to infringe, the mark of the plaintiff." *Estee Lauder, Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1508 (2d Cir.1997); *see also Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998).

### 1. Validity of the Trademark

"The degree to which a mark is entitled to protection under the [Lanham] Act de-

pends on whether the mark is classified as (a) generic, (b) descriptive, (c) suggestive, ... (d) arbitrary or [ (e) ] fanciful." *Estee Lauder,* 108 F.3d at 1508; *see also Pebble Beach Co. v. Tour 18 I Ltd.,* 155 F.3d 526, 540 (5th Cir.1998); *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir.1993); *Union Nat'l Bank of Texas, Laredo, Texas v. Union Nat'l Bank of Texas, Austin, Texas,* 909 F.2d 839, 844 (5th Cir.1990).

■ "A generic mark ... is never protectable because it connotes 'a particular genus or class of which an individual [product] or service is but a member ...', rather than the more individualized characteristics of a particular product.'" *Pebble Beach,* 155 F.3d at 540 (second and third alterations in original) (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 790 (5th Cir.1983)). A descriptive mark is protectable only when it has acquired a secondary meaning in the minds of the consuming public. *See Pebble Beach,* 155 F.3d at 526; *Platinum Home Mortgage,* 149 F.3d at 727. "A mark ... is descriptive if it 'identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients.'" *Pebble Beach,* 155 F.3d at 527 (quoting *Zatarains,* 698 F.2d at 790). "[I]n many cases, a descriptive term will be an adjective such as 'speedy,' 'friendly,' 'green,' 'menthol,' or 'reliable.'" *Union Nat'l Bank,* 909 F.2d at 845.

"The last three categories—suggestive, arbitrary, and fanciful—are inherently distinctive, requiring no additional showing to be protectable, 'because their intrinsic nature serves to identify a particular source of a product.'" *Pebble Beach,* 155 F.3d at 540 (quoting *Sunbeam Prods., Inc. v. West Bend Co.,* 123 F.3d 246, 252 (5th Cir.1997), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998)). A suggestive mark is one which " 'suggests rather than describes some particular characteristic of the goods or services to which it applies and requires the imagination in order to draw a conclusion as to the nature of goods

and services.'" *Union Nat'l Bank,* 909 F.2d at 845 (quoting *Zatarains,* 698 F.2d at 791); *see also First Sav. Bank, F.S.B. v. First Bank Sys., Inc.,* 101 F.3d 645, 655 (10th Cir.1996). "An oft-cited example of a suggestive term is 'Penguin' as applied to refrigerators." *Union Nat'l Bank,* 909 F.2d at 845. Arbitrary and fanciful marks are those that are not suggestive of the products or services with which they are associated. *See id.* "An arbitrary mark has a common meaning unrelated to the product for which it has been assigned, such as APPLE when applied to computers," *First Sav. Bank,* 101 F.3d at 655, or " 'Ivory' as applied to soap." *Union Nat'l Bank,* 909 F.2d at 845. "Fanciful" marks, by contrast, are usually "coined words, such as 'Xerox' or 'Kodak,'" that signify nothing but the product. *Id.; see also First Sav. Bank,* 101 F.3d at 655.

Because only suggestive, arbitrary, and fanciful terms are federally registrable without proof of secondary meaning, "[p]roof of registration of a service mark or trademark [provides] ... prima facie evidence of the registrant's exclusive right to use the mark in commerce for the services specified in the registration.... A registration ... becomes conclusive evidence of a registrant's exclusive right to use a mark after five consecutive years of continuous use in commerce, subject to a few enumerated defenses." *Elvis Presley Enters., Inc. v. Capece,* 141 F.3d 188, 194 (5th Cir.1998) (citations omitted); *see also* 15 U.S.C. §§ 1065, 1115.

■ Quantum Fitness federally registered the "Quantum Fitness" mark in 1992 for "pin select weight machines and free weight benches for sale to and use in the commercial fitness market." Quantum Fitness has continuously used this mark for more than five years. (P. Exs.12, 15). Quantum Fitness federally registered the "Quantum" mark in 1998, for "exercise equipment, namely, free weights, benches and exercise machines for use in the commercial market." (P.Ex. 14). The "Quantum Fitness" mark is conclusively entitled

to protection from infringement from junior users for the claimed uses; the "Quantum" mark is *prima facie* valid for its claimed applications. *See* 15 U.S.C. § 1115; *Elvis Presley Enters.*, 141 F.3d at 194.

■ Quantum LifeStyle argues that the "Quantum Fitness" mark is not protectable because it is merely descriptive of the products and services that Quantum Fitness provides. However, "the holder of a registered mark may rely on incontestability to enjoin infringement and such an action may not be defended on the grounds that the mark is merely descriptive." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 205, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985); *see also Service Merchandise Co. v. Service Jewelry Stores, Inc.*, 737 F.Supp. 983, 992 (S.D.Tex.1990). Furthermore, the "Quantum Fitness" mark and the "Quantum" mark are arbitrary, not descriptive, as discussed below. For the purpose of establishing their protectability in an infringement suit, both of Quantum Fitness's registered marks are valid. *See Meredith*, 991 F.2d at 1077.

## 2. Infringement of a Trademark

To demonstrate that a protectable, federally registered trademark has been infringed under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114 (1998), a plaintiff must show that a defendant used (1) any reproduction, counterfeit, copy or colorable imitation of the mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods; (5) where such use was likely to cause confusion or to cause mistake or to deceive. *See id.* § 1114(1)(a); *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1009–10 (5th Cir.1975).

■ The first four requirements are easily satisfied in most cases and have been satisfied here. " 'Likelihood of confusion' is thus the central issue in any suit for trademark infringement." *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 594 (5th Cir.1985); *Pebble Beach,* 155 F.3d at 542 ("The touchstone of infringement is whether the use creates a likelihood of confusion as to the 'source, affiliation, or sponsorship' of [the trademarked product]."). "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Elvis Presley Enters.,* 141 F.3d at 193.

■ A court examines the following nonexhaustive list of factors in determining whether a likelihood of confusion exists:

(1) the type of trademark allegedly infringed,

(2) the similarity between the two marks,

(3) the similarity of the products or services,

(4) the identity of the retail outlets and purchasers,

(5) the identity of the advertising media used,

(6) the defendant's intent, and

(7) any evidence of actual confusion.

*Elvis Presley Enters.,* 141 F.3d at 194. "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.' " *Id.* (quoting *Conan Prop., Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 150 (5th Cir.1985)). This court considers each of these digits of confusion in turn, to determine whether Quantum LifeStyle's use of the word "Quantum" in its name and tradename would likely confuse the public.

### a. The Type of Trademark at Issue

This first factor raises the question of whether Quantum Fitness's marks are strong or weak. The strength of a trademark in the marketplace is measured by its effectiveness in identifying a source of goods. *See Sunbeam Prods.,* 123 F.3d at 252 ("The gravamen of trademark law is

source identification."). "In looking at the strength of the mark, the focus is the senior user's mark." *Elvis Presley Enters.*, 141 F.3d at 201. "The stronger the mark, the more likely it is that encroachment on it will produce confusion," *Champions Golf Club, Inc. v. The Champions Golf Club,* 78 F.3d 1111, 1117 (6th Cir. 1996), and "the greater protection it receives." *Elvis Presley Enters.*, 141 F.3d at 201.

■ One measure of the strength of a trademark is its classification into one of five categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *See Pebble Beach Co.*, 155 F.3d at 540; *Union Nat'l Bank,* 909 F.2d at 844. Quantum Fitness's use of the word "quantum" in its marks for exercise and fitness equipment is arbitrary; "quantum" "has a common meaning unrelated to the product for which it has been assigned." Quantum Fitness refers this court to the definition of "quantum" found in THE MERRIAM-WEBSTER DICTIONARY 425 (Home and Office ed.1995), which reads: "1: QUANTITY, AMOUNT 2: an elemental unit of energy." (P.Ex. 116).[3] The use of the word "quantum" by Quantum Fitness is not descriptive because it does not identify a characteristic or quality of the products or services that Quantum Fitness designs, manufactures, and sells. Nor is the use of the word "quantum" suggestive; it does not suggest any particular characteristic of Quantum Fitness's goods, or permit a customer through imagination to draw a conclusion as to the nature of Quantum Fitness's goods and services.

The absence of a connection between the term "quantum" and the plaintiff's products is evidenced by the frequent use of the word by third parties in a variety of different, unrelated lines of business. A survey of the case law supports the classification of the Quantum Fitness trademarks as arbitrary. *See Fuji,* 754 F.2d at 596 (holding that "FUJI" mark was arbitrary as applied to graphic arts material); *Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1159–60 (5th Cir.1982) (holding that the "Armco" mark was arbitrary as applied to a steel company); *Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n,* 651 F.2d 311, 315 (5th Cir. 1981) (noting that the "Sun" mark was arbitrary as applied to a financial holding company); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 260 (5th Cir.1980) (holding that the "Domino" mark was arbitrary as applied to sugar and related products).

■ Classifying Quantum Fitness's marks as arbitrary does not end the inquiry. "This label alone . . . does not precipitate absolute protection. Arbitrariness refers to the quality of the mark . . . . The ultimate strength of the mark, the key inquiry before us, is determined by a number of factors which establish its standing in the marketplace." *Sun Banks,* 651 F.2d at 315; *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21, comment i (1995) (noting that classifications of a term on the spectrum of distinctiveness are "not conclusive of 'strength,' however, since the issue ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source"); 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:83, at 11–140 to –141 (4th ed.1998).

"Marks may be strengthened [in the marketplace] by extensive advertising, length of time in business, public recognition, and uniqueness." *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988). By these criteria, Quantum Fitness has established a relatively strong mark within the fitness industry. Quantum Fitness president Brooke Ayton testified that since Quantum Fitness began business in 1990, it has incurred over $1 million in advertising expenses. Since 1995 alone, Quantum Fit-

---

**3.** The dictionary definition of "quantum" quoted by Quantum LifeStyle is not substantially different and would not change this court's analysis. (Docket Entry No. 4, p. 7).

ness has spent nearly $700,000 to advertise its products and related services.[4] (P. Exs.82–86). Ayton also testified that Quantum Fitness has distributed over one hundred thousand promotional brochures nationwide, in health clubs and fitness facilities, and to its own dealers. Quantum Fitness's products have received extensive and favorable reports in local and national health and fitness publications.[5] (P. Exs.71, 72).

Another factor in determining the strength of a mark in the marketplace is the extent of third-party usage of similar marks. *See First Sav. Bank*, 101 F.3d at 653; *Union Nat'l Bank*, 909 F.2d at 848 n. 24; *Armco*, 693 F.2d at 1159–60; *Sun Banks*, 651 F.2d at 316; *Amstar*, 615 F.2d at 259–60. "The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion ...." *Amstar*, 615 F.2d at 259–60 (alteration in original) (quoting RESTATEMENT OF TORTS § 729 cmt. g (1938)). The logic behind this rule is that "customers [may] have become so conditioned by a plethora of such similar marks that customers 'have become educated to distinguish between different [such] marks on the basis of minute distinctions.'" 2 MCCARTHY, *supra*, § 11:88, at 11–149 (quoting *Standard Brands, Inc. v. RJR Foods, Inc.*, 192 U.S.P.Q. 383, 1976 WL 21135 (T.T.A.B.1976)).

▪ Unlike some courts,[6] the Fifth Circuit considers evidence of third-party usage of a mark on *unrelated* goods and services in assessing the mark's strength in the marketplace. *See Union Nat'l Bank*, 909 F.2d at 848 n. 24; *Sun Banks*, 651 F.2d at 315–16; *Amstar*, 615 F.2d at 259–60. While the Fifth Circuit requires a broad examination of the marketplace, it also recognizes that extensive third-party usage may weaken a mark but does not in itself eliminate a mark's protectability in all cases. Instead, third-party usage may limit the scope of protection for a mark when the mark is used for purposes "outside the uses to which plaintiff has already put its mark." *Amstar*, 615 F.2d at 259; *see also Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 281 (6th Cir.1997) (holding that registered marks incorporating the phrase "Daddy's" for other lines of business did not weaken the plaintiff's mark "for the specific purpose of retail sales of musical instruments")

---

4. Quantum Fitness has submitted examples of advertisements that it has run in various publications. (P. Exs. 62–70).

5. Ayton's "conservative" estimate, based on discussions with his salespeople, was that over two thousand facilities, such as health clubs, workout centers in schools, office buildings, hotels, spas, and rehabilitation centers, use Quantum Fitness products. Based on this estimate, Ayton calculated that over forty thousand people see and use Quantum Fitness equipment every day. This calculation was based on Ayton's "conservative" assumption that twenty people use the equipment each day in each facility. These users are aware of the source of the equipment because each product Quantum Fitness manufactures or sells carries a "Quantum" or "Quantum Fitness" mark.

6. Several courts have held that evidence of third party usage of the mark on wholly unrelated products is of little probative value. *See, e.g., Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877–78 (Fed.Cir.1992); *National Cable Television Ass'n v. American Cinema Editors, Inc.*, 937 F.2d 1572 (Fed.Cir.1991); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir.1970); *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609 (7th Cir.1965).

The *American Cinema* court articulated the rationale for this view by way of the following example:

ACE for canned, large peas could not escape likelihood of confusion with a prior use of ACE for canned, small peas because ACE is concurrently used by unrelated third parties on aircraft, clothing, computer services, hardware or even bread, bananas, milk and canned carrots. Properly defined, the relevant public in the example need be defined no broader than purchasers of canned peas, and the third party ACE marks outside the segment become essentially irrelevant.

*American Cinema*, 937 F.2d at 1579.

In *Amstar*, the plaintiff, which distributed sugar products under the name "Domino," had a established a "distinctive, well-known mark for its sugar and related products." *Amstar*, 615 F.2d at 259. The Fifth Circuit rejected the plaintiff's infringement claim against a pizza company that used the name "Domino's" for its products. The court noted the extensive third-party usage of the name "Domino." However, the Fifth Circuit carefully limited its holding by stating that the "Domino's" mark "should be accorded only limited protection *outside* the plaintiff's sugars and related food products." *Id.* (emphasis added). The court cited with approval the Trademark Trial and Appeal Board's decision not to register a "Domino" mark for a third-party's sugar-related products. *See id.* at 260 n. 7. The *Amstar* court recognized that "[a] mark which is relatively weak in the overall market for all goods and services can nonetheless be strong enough to make confusion likely when a junior user uses a similar mark in the same general line of business." 2 McCARTHY, *supra*, § 11:77, at 11–134.1. "Even a 'weak' mark has at least some strength to cause likely confusion when another edges very close [to the original mark's goods or services]." *Id.* § 11:76, at 11–133.[7]

In this case, Quantum LifeStyle has submitted substantial evidence of third-party use of the word "quantum." Southwestern Bell's telephone business directories from five of Texas's largest cities list a total of seventy-seven companies using the word "quantum" in their names.[8] (D.Exs.5–9). Quantum LifeStyle has submitted the results of Internet searches for company names using the word "quantum." (D.Exs.22–35). These searches, covering fourteen different states, produced a total of 716 different listings. Finally, Quantum LifeStyle has introduced evidence that the USPTO databank contains 304 registered or pending trademarks that include the word "quantum." (Docket Entry No. 4, p. 8; *Id.*, Ex. G).

■ Quantum LifeStyle has demonstrated widespread use of the word "quantum" in names and marks used by third parties. However, Quantum Fitness has shown that only two of the identified uses of the word "quantum" were in a mark or name of a company in the business of providing fitness equipment or related services.[9] One of these companies was located in Saskatchewan, Canada; the other was a health club located in Indonesia.

---

**7.** In *Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311 (5th Cir. 1981), the Fifth Circuit found that the extensive third-party usage of the "Sun" mark was "impressive evidence that there would be no likelihood of confusion between" the marks of the plaintiff, Sun Banks of Florida, Inc., and the defendant, Sun Federal Savings and Loan Association. *Id.* at 316. In reaching this conclusion, the *Sun Banks* court did not apply the distinction mentioned in *Amstar* between third-party usage in the plaintiff's line of business and third-party usage outside this line of business. However, *Sun Banks* is distinguishable because the court had found extensive third-party usage of the "Sun" mark by other financial institutions. *See id.* at 316 & n. 8. In this case, the third-party usage of the word "Quantum" is almost exclusively outside the fitness industry.

**8.** The Austin business white pages directory lists ten separate companies using the term "quantum" in their name. (D.Ex. 5). The

Dallas business white pages directory lists twenty-two companies, (D.Ex. 6); the Fort Worth business white pages directory lists five companies, (D.Ex. 7); the San Antonio business white pages directory lists nine companies, (D.Ex. 8); and the Houston business white pages directory lists thirty-one companies. (D.Ex. 9).

**9.** Quantum Fitness employee Krista Davis testified that, at the request of the Quantum Fitness attorney, she called a number of the Texas businesses listed in telephone directories as using the "quantum" mark and inquired about the nature of these businesses. She reported that none provided goods or services relating to the fitness industry. Quantum LifeStyle dismissed her testimony as "unscientific," but did explain why it was inaccurate, rather than incomplete. Quantum LifeStyle has not rebutted the testimony that no other health and fitness club in the United States uses "Quantum" as part of its name.

(D.Ex. 11). The existence of these companies is irrelevant to the present analysis; both are beyond the reach of American trademark law,[10] and neither has a presence in Quantum Fitness's market areas. The record before this court discloses no company other than Quantum LifeStyle operating a health and fitness club in the United States using "Quantum" in its name.

Quantum LifeStyle asserted that some of the third-party users of the word "quantum" in their trademarks or names provided a variety of health care services, including physical therapy offices, magnetic resonance imaging clinics, and chiropractors' offices. However, such uses are at best tangentially related to Quantum Fitness's business.[11] Quantum LifeStyle has not provided persuasive evidence of third-party usage of the word "quantum" in marks or names used in the fitness and exercise industry.

This court finds that Quantum Fitness's mark, while weak in the overall market for goods and services, is sufficiently strong in the fitness industry to create a likelihood of confusion if a junior user, such as Quantum LifeStyle, uses a similar mark in the same industry.

### b. The Similarity in Appearance Between the Two Marks

Quantum Fitness has registered "Quantum Fitness" and "Quantum" as marks without specifying any particular stylized design. Quantum Fitness uses these marks in a number of promotional materials, sometimes with a stylized "Q," (*see* P. Exs. 26–30, 31i, 33, 35, 59, 62–66), and sometimes without. (*See* P. Exs. 31, 32, 34). Quantum LifeStyle uses the mark "QLS QuantumLifeStyle Center" in advertisements and promotional materials, with the word "Quantum" set off from the rest of the name though the use of boldface lettering and a slightly larger font. (P. Exs.92–95, 97–100). The question is whether the two marks are sufficiently similar in appearance to result in confusion in the marketplace.

■ "The similarity of the marks in question is determined by comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters.*, 141 F.3d at 201. This comparison, often called an "eyeball" test, emphasizes the "total effect rather than individual features." *Service Merchandise*, 737 F.Supp. at 992 (citing *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir.1980)). " 'Even if prospective purchasers recognize that the two designations are distinct, con-

---

10. In determining whether the Lanham Act can be applied extraterritorially, courts are to consider: "(i) whether the defendant is a United States citizen, (ii) whether there exists a conflict between the defendant's trademark rights under foreign law and the plaintiff's trademark rights under domestic law; and (iii) whether the defendant's conduct has a substantial effect on United States commerce." *Atlantic Richfield Co. v. Arco Globus Int'l Co.*, 150 F.3d 189, 192 (2d Cir.1998); *see also Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952); *American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n*, 701 F.2d 408, 414 (5th Cir.1983). In this case, because there is no indication that the fitness-related companies in Canada and Indonesia have United States citizenship or that their business conduct has a substantial effect on United States commerce, these companies are beyond the reach of United States trademark law.

11. These uses do have some overlap with part of the business of both Quantum LifeStyle and Quantum Fitness. Quantum LifeStyle intends to provide physical therapy and rehabilitation exercises. Quantum Fitness designs, manufactures, and sells equipment for use in physical therapy and rehabilitation. However, any commonality between the third-party usage and Quantum LifeStyle is not probative, because the focus is on the senior user's mark in the "likelihood of confusion" analysis. Evidence relating to extensive third-party usage in lines of business similar to the junior user's is probative only of the senior user's lack of enforcement of its mark in similar situations. In this case, this court finds that Quantum Fitness has actively sought to protect its mark from infringement within the fitness industry. (P. Exs. 17–25).

fusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. The relevant inquiry is whether, under the circumstances of the use,' the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Elvis Presley Enters.*, 141 F.3d at 201 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21 cmt. c (1995)).

Quantum Fitness asserts that the "QLS QuantumLifeStyle Center" and Quantum Fitness marks are sufficiently similar in appearance to create confusion in the marketplace. Quantum Fitness argues that the " 'Quantum' portion of both Plaintiff's and Defendant's marks is the dominant portion, by virtue of ... [the] use of the rare and infrequently found initial letter 'Q', ... [the] use of the initial letter 'Q' in a unique and stylized form within the mark," and the defendant's use of boldface lettering and a larger font size to set off the term "Quantum." (Docket Entry No. 3, pp. 11–12). Quantum LifeStyle responds that the marks "are not confusingly similar to the ordinary purchaser of the products of both parties" because the Quantum LifeStyle "trademark is uniquely set out by use of the letters QLS before the contiguous wor[d] QuantumLifeStyle and the descriptive word center describing the mark as a facility." (Docket Entry No. 4, p. 8).

Quantum LifeStyle's use of another descriptive word in its mark does not guarantee that confusion will not occur. "[O]ne feature of a mark may be more significant than other features, and ... it is proper to give greater force and effect to that dominant feature." *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570 (Fed.Cir.1983); *see also Kangol Ltd. v. Kangaroos U.S.A., Inc.*, 974 F.2d 161, 163 (Fed.Cir.1992); *Country Floors, Inc. v. A Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1065 (3rd Cir.1991); *Marathon Mfg. Co. v. Enerlite Prod. Corp.*, 767 F.2d 214, 219 (5th Cir.1985).

"When the dominant portion of two marks are the same, confusion is likely." *Country Floors*, 930 F.2d at 1065 (citing *Century 21*, 846 F.2d at 1179).

The cases are heavily fact-specific. They illustrate that the courts closely examine allegedly competing marks to determine the dominant features and whether confusion is likely to result from any similarities. For example, in *Giant Food*, a supermarket chain using the service marks GIANT and GIANT FOOD sued a restaurant chain using the mark GIANT HAMBURGERS, alleging trademark infringement. In finding for the plaintiff, the court observed that the word "GIANT" was dominant in both marks, in large part because the word was set off from the rest of the marks through the use of capital letters. *See Giant Food*, 710 F.2d at 1570. In *Century 21*, the plaintiff, which operated a system of franchised real estate brokerage offices under the service mark "Century 21," brought a trademark infringement suit against one of its former franchisees, doing business as "Century Investments & Realty." In affirming a grant of summary judgment in favor of the plaintiff, the Ninth Circuit observed that "[t]he identical dominant term 'Century' is the lead word in each entity's name, which can foster confusion." *Century 21*, 846 F.2d at 1179. In *Country Floors*, a corporation that manufactured and sold ceramic tiles under the tradename and service mark "Country Floors," brought a trademark infringement claim against a competitor doing business as "Country Tiles." The district court had granted summary judgment in favor of the defendant. In vacating the district court's order, the Federal Circuit observed that the word "Country" could be considered the dominant portion of both parties' service marks, because the descriptive words "floor" and "tile" had been disclaimed. *See Country Floors*, 930 F.2d at 1065.

By contrast, in cases finding no infringement, the courts emphasize differences in the overall design and appearance of the

competing marks. For example, in *Universal Money Ctrs., Inc. v. AT & T*, 22 F.3d 1527 (10th Cir.1994), the plaintiff was an ATM card issuer that had registered trademarks of "Universal Money Card," "Universal Money Center," and "Universal Money." Plaintiff sued defendant for issuing a credit card labeled the "A T & T Universal Card." Even though the dominant portion of these marks may have been the term "Universal," the court found a slim likelihood of confusion because of differences in the overall design of the cards, including lettering styles, logos, and coloring schemes. The court pointed out that even though the term "money" was disclaimed in the plaintiff's trademark, it was still part of the mark and had to be considered in the "likelihood of confusion" analysis. The court also noted that the plaintiff rarely used the "Universal" mark alone, but rather with the word "money."

Similarly, in *Amstar*, both the name for sugar products and the name for pizza were dominated by the word "Domino," but the court found no infringement because defendant's mark was "stylistically and typographically distinguishable." *Amstar*, 615 F.2d at 261. The court noted that the plaintiff's mark was "almost always . . . presented on a bias with respect to the horizontal," in contrast with the defendant's mark. *Id.* The court also observed that defendant's use of the term "Domino," in possessive form, next to the word "pizza," created an "Italian connotation" very different from the one created by the juxtaposition of the terms "Domino" and "sugar." *Id.*

In this case, because Quantum Fitness disclaimed the word "fitness" as part of its mark, the word "Quantum" is the dominant portion of the "Quantum Fitness" mark. *See* 3 McCARTHY, *supra*, § 23:45, at 23–98 ("A disclaimed segment of a composite registration is not the 'dominant' part."). Although Quantum LifeStyle does not use the word "Quantum" standing alone, that word is the dominant portion of the Quantum LifeStyle mark because Quantum LifeStyle prominently sets off this word from the rest of its mark in its advertising and promotional materials. These factors weigh in favor of finding a likelihood of confusion.

There are significant visual dissimilarities between the marks. The marks do not have a physical appearance that, standing alone, is likely to result in or increase confusion. However, this court finds that given the dominance of the word "Quantum," under the circumstances of the use, "the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Elvis Presley Enters.*, 141 F.3d at 201.

### c. The Similarity of the Products or Services

The third factor to consider is the similarity of the products and services the parties offer. "The greater the similarity between products and services, the greater the likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 202 (quoting *Exxon*, 628 F.2d at 505).

Quantum Fitness designs, manufactures, and sells fitness equipment to a variety of commercial users, including health clubs, health spas, hotels, hospitals, schools, apartment buildings, rehabilitation facilities, and corporate health facilities. A small percentage of Quantum Fitness's sales are made directly to the public. Quantum Fitness's relationship with its customers continues after it sells them equipment; Quantum Fitness services the equipment, helps its customers with equipment layout, and designs specific exercise programs tailored to its equipment. (P.Ex. 118).

Quantum LifeStyle styles itself as a "holistic" health club. Quantum LifeStyle provides its members cardiovascular and weight training equipment for use at its facility. Quantum LifeStyle also intends to offer its members other programs and services, including a day spa and salon, aerobics, fitness testing, nutritional coun-

seling, and personal training. Bauer resisted calling Quantum LifeStyle a "fitness club," testifying that providing exercise equipment was "only a small part of what we do." However, Bauer's reluctance does not credibly establish that he is doing business in a different field than Quantum Fitness. Bauer admitted that he spent nearly $300,000 to buy and lease exercise equipment for the club. Bauer's own employees acknowledged that the club is part of the fitness and exercise industry. (Testimony of Lisa D'Angelo). Moreover, Bauer applied for, and received, a state license to operate as a health spa. (P.Ex. 104, Testimony of Kyle Bauer).

Quantum LifeStyle asserts that there is no likelihood of confusion because it provides fitness-related *services*, while Quantum Fitness provides fitness-related *products*. Quantum Fitness responds that its exercise equipment and the associated exercise programs are "complementary" with Quantum LifeStyle's exercise and fitness facility. Quantum Fitness contends that the businesses are so closely related that consumers are likely to believe that Quantum LifeStyle is sponsored by, or affiliated with, Quantum Fitness. Because of the complementary nature of a health club and exercise equipment, the danger that the public will believe that the former is associated with the latter is particularly high.[12]

"Complementary products have been held particularly susceptible to confusion." *Fuji*, 754 F.2d at 598. In *Fuji*, the defendant made and sold printing presses. The plaintiff made a variety of photography-related products, some of which were used in the offset printing process. *See id.* at 593. The *Fuji* court found that the complementary nature of the products and the similarity of the names was likely to produce confusion in the public: "[The defendant's] presses are useless without equipment and materials of the sort made by [the plaintiff] (among others); some of [the

plaintiff's] products are useless without an offset press like [the defendant's]." *Id.* at 598. Similarly, Quantum Fitness's high-end exercise equipment would be useless without commercial health and fitness club purchasers such as Quantum LifeStyle; Quantum LifeStyle could not offer a full array of services necessary to attract and hold its members if it did not offer exercise equipment of the type designed, manufactured, and sold by Quantum Fitness.

Two lines of business can be complementary, even if one provides goods and the other provides services. In *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857 (5th Cir.1967), the plaintiff unsuccessfully sought an injunction against the defendant based on alleged patent infringement. The Fifth Circuit reversed the district court's denial of injunctive relief, in part because the district court was "laboring under the serious misapprehension that ... the absence of competition between the parties, one a *manufacturer* of internal combustion engines, the other engage[d] primarily in the *servicing* of transient aircraft," compelled the denial of relief. *Id.* at 860 (emphasis added). In *Steelcase Inc. v. Steelcare Inc.*, 219 U.S.P.Q. 433, 1983 WL 50156 (T.T.A.B. 1983), an office furniture manufacturer successfully opposed the registration of a mark that the applicant intended to use primarily in its business of refinishing "worn, chipped or scarred office furniture." *Id.* at 435, 1983 WL 50156. The Trademark Trial and Appeal Board observed that "[i]t is well recognized that confusion in trade is likely to occur from the use of similar or the same marks for goods and products on the one hand and for services involving those goods and products on the other." *Id.* In this case, the distinction between fitness and exercise equipment on the one hand and fitness and exercise facilities and programs on the other hand does

---

**12.** The exercise programs Quantum Fitness designs and distributes with the equipment it designs, manufactures, and sells, are directly

competitive with exercise programs offered at Quantum LifeStyle.

not defeat Quantum Fitness's application for injunctive relief.

Quantum Fitness argues that "[d]irect competition between the parties' services or products is not required in order to find a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 202; *see also Marathon Mfg.*, 767 F.2d at 220. "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection. The danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand." *Elvis Presley Enters.*, 141 F.3d at 202 (citations omitted). Quantum Fitness asserts that Quantum LifeStyle's health club business is one into which consumers might expect a manufacturer and seller of exercise equipment, such as Quantum Fitness, to expand. Quantum Fitness is most concerned that its primary purchasers, health clubs and facilities that directly compete with Quantum LifeStyle, will believe that Quantum Fitness is expanding into the health club part of the fitness industry. If health clubs and facilities facing competition from Quantum LifeStyle conclude from the similarity in the names that Quantum Fitness is expanding into the complementary health club business, in competition with its own customers, they will be unwilling to continue to purchase equipment from Quantum Fitness.

The record supports Quantum Fitness's concerns. Brooke Ayton testified that he frequently receives inquiries, primarily from his health club and spa customers, as to whether Quantum Fitness plans to expand into the business of owning and operating a health club. The perception that Quantum Fitness might expand into the business of operating health clubs is bolstered by the complementary nature of the goods it provides with the services it could potentially offer. Ayton testified that he

has no such expansion plans because such a move would undermine his relationship with his customers. Ayton's actual intent not to expand "is not particularly probative of whether [Quantum LifeStyle]'s market is one into which [Quantum Fitness] would naturally expand. Consumer perception is the controlling factor." *Elvis Presley Enters.*, 141 F.3d at 202 (citations omitted). " 'If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely.' " *Id.* (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 21 cmt. j (1995)).

Because of the complementary nature of the lines of business of Quantum LifeStyle and Quantum Fitness, and because of the danger of consumer perception of sponsorship and affiliation, this court finds that the possibility of confusion is not obviated simply because Quantum Fitness is primarily engaged in manufacturing and selling goods while Quantum LifeStyle provides services.

### d. The Identity of the Retail Outlets and Purchasers

Differences in the parties' customer bases can lessen the likelihood of confusion. *See Exxon*, 628 F.2d at 505–06; *Amstar*, 615 F.2d at 262; *CICCorp., Inc. v. AIM-Tech Corp.*, 32 F.Supp.2d 425, 437 (S.D.Tex.1998). Quantum Fitness sells the vast majority of its equipment to commercial users; less than five percent of its business consists of direct sales to individual consumers. Quantum LifeStyle's customers, by contrast, are individuals who live or work in the vicinity of its health club facility.[13]

While there is little direct overlap in the customer bases, members of fitness clubs, such as Quantum LifeStyle, are indirect customers of Quantum Fitness. The rec-

---

13. Quantum LifeStyle's base of potential customers will grow if Bauer follows through with his plan to open ten new facilities in

Texas in the near future and to pursue nationwide expansion.

ord makes it clear that the end users' preferences for specific types or makes of exercise and fitness equipment greatly influence the purchasing decisions of commercial customers, such as health clubs. Manufacturers routinely provide health clubs and other commercial users with pieces of equipment at no cost, on a trial basis, to build demand for their products. If a piece of equipment proves popular, the health club will often purchase it. For this reason, Quantum Fitness directs much of its marketing effort toward the general public, including both potential and present members of health clubs.

This court finds that the lack of direct overlap between the parties' customer bases is mitigated by the complementary nature of the markets, and by the fact that the same market of end users use both Quantum Fitness's products and Quantum LifeStyle's facility. This digit does not weaken Quantum Fitness's showing of a likelihood of confusion.

### e. The Advertising Used

Courts also consider is the similarity between parties' marketing efforts: "the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 555 (10th Cir.), *cert. denied*, 525 U.S. 964, 119 S.Ct. 408, 142 L.Ed.2d 331 (1998); *see also CICCorp*, 32 F.Supp.2d at 437.

Quantum Fitness and Quantum LifeStyle have used different channels in their print advertising campaigns.[14] In addition to advertising in the local "yellow pages," (P.Ex. 62), Quantum Fitness has run advertisements in specialized trade industry publications, including *Athletic Business, CBI, Club Industry, On Site Magazine, Fitness Management,* (P. Exs.63–70), which appear to circulate nationally. By contrast, Quantum LifeStyle has adver-

tised in local publications such as *The Humble Observer* and *The Kingwood Observer,* targeting members of the general public who live or work in the area. (P. Exs.92, 94, 95).

This difference in the parties' advertising campaigns reflects Quantum Fitness's national market of commercial purchasers and the customers of the commercial purchasers, the end users. Quantum Fitness also uses mass mailings of marketing pamphlets and brochures to target its potential commercial customers. Ayton testified that Quantum Fitness has distributed more than one hundred thousand marketing brochures to potential commercial customers. While Quantum LifeStyle has also used mass mailings, these mailings were distributed locally to potential members of its club, who are often the end users of fitness equipment.

While much of Quantum Fitness's marketing efforts is geared toward commercial customers, it also targets end users. Quantum Fitness advertises at trade shows and sponsors fitness shows and weightlifting programs, all of which are open to the public. In addition, each Quantum Fitness product displays the "Quantum" or "Quantum Fitness" mark, as do the accompanying instructional materials. Quantum Fitness has also established an Internet web site on which its catalog is posted.

Some of the marketing channels that Quantum Fitness uses to target end users overlap with those used by Quantum LifeStyle. Both parties issue press releases to local publications to generate favorable publicity. Quantum Fitness works with its commercial clients to design brochures praising the quality of the exercise equipment, which are distributed to end users. Quantum Fitness also distributes promotional pamphlets and flyers to end users

---

**14.** They is also a sizable difference between the parties' advertising efforts. Ayton testified that Quantum Fitness has spent in excess of $1 million to advertise its products since

1990. Bauer estimated that Quantum LifeStyle had spent approximately $20,000 for marketing expenses as of mid-January 1999.

in clubs. Quantum LifeStyle also uses flyers and pamphlets to attract potential end users to its club.

Based on this record, this court finds some overlap in the parties' marketing campaigns. This factor does not weigh in favor of or against a finding of a likelihood of confusion.

### f. The Defendant's Intent

■ "Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 203. However, "[i]f a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of a likelihood of confusion." *Id.* Direct proof of bad faith is rarely present. Nor does an inference of bad faith necessarily arise from the junior users's knowledge or awareness of the senior user's trademark. *See Conans Pizza*, 752 F.2d at 150; *Armco*, 693 F.2d at 1159 n. 7; *Amstar*, 615 F.2d at 263 & n. 9. *But see Big Daddy's Family Music Ctr.*, 109 F.3d at 287. "The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir.1984); *see also Sunbeam Prods.*, 123 F.3d at 258.

Bauer's claim that he had not heard of Quantum Fitness before August 1998 is not credible. Bauer is a longstanding fitness devotee and exercise equipment user, with a background in physical rehabilitation work. In addition, he researched health clubs in preparation for his own business venture. It is simply not credible that he was completely unaware of one of the leading brands of weight training and exercise equipment, especially in light of Quantum Fitness's broad client base in this geographic area. (P. Exs.73–81). Bauer's admission that in May 1998, he considered calling his club "Quantum Health & Fitness Center," before deciding to retain the "QLS QuantumLifeStyle Center" mark, permits an inference that Bauer knew about the "Quantum Fitness" mark

and had reservations about using a virtually identical name.

In addition, Bauer testified that before opening Quantum LifeStyle, he visited the Lake Houston Gym & Fitness club, which is located close to the Quantum LifeStyle site. Bauer testified that the purpose of his visit was to scrutinize a potential competitor. Lake Houston Gym & Fitness purchased its equipment from Quantum Fitness. Bauer testified that he toured the club, asked about the club's prices, and examined the club's child care facilities and restrooms. The record shows that one of the major points of competition among fitness clubs is their exercise equipment. Yet Bauer testified that he never bothered to examine the equipment at the Lake Houston gym, which was, by his own admission, only a short distance away from the restrooms. This court finds that Bauer knew about Quantum Fitness long before August 1998.

■ This court can find bad faith only if it finds that Bauer adopted the Quantum LifeStyle mark with the specific intent of deriving benefit from the reputation or goodwill of Quantum Fitness. There is little evidence in the record on this issue. Bauer testified that he relied on a design firm to check whether similar marks were used in the fitness industry, and that he took no steps to learn whether the design firm had checked on the name "Quantum." Despite this court's finding that Bauer was not credible in testifying as to his knowledge of the "Quantum Fitness" brand of exercise and training equipment, the evidence on the present record is insufficient to show that Bauer chose his mark specifically intending to confuse or deceive customers.

■ Quantum Fitness makes two other arguments related to Bauer's prior constructive or actual knowledge of the Quantum mark. First, Quantum Fitness argues that federal registration provided Quantum LifeStyle constructive notice of its marks. However, the mere prior exis-

tence of a federally registered mark does not demonstrate that Quantum LifeStyle intentionally copied that mark. "[O]therwise, presumably all trademark infringement cases could result in a finding of intentional copying." *Big Daddy's Family Music Ctr.,* 109 F.3d at 287. Second, Quantum Fitness argued that once it delivered its notice letter to Quantum LifeStyle, on September 10, 1998, Quantum LifeStyle deliberately continued using and promoting its mark, despite its awareness of Quantum Fitness's potential infringement claim. This second argument is also unpersuasive, because "after a warning from plaintiff, defendant's attempt in good faith to obtain a judicial determination of trademark rights should be no indication of evil intent or bad faith." 3 McCarthy, *supra,* § 23:120, at 23–226.

This court's finding that the evidence is inadequate on the present record to permit the conclusion that Quantum LifeStyle acted in bad faith means that "this digit of confusion becomes a nonfactor in the likelihood-of-confusion analysis, rather than weighing in favor of a likelihood of confusion." *Elvis Presley Enters.,* 141 F.3d at 203.

### g. Any Evidence of Actual Confusion

"Evidence of actual confusion is not necessary to a finding of a likelihood of confusion, but 'it is nevertheless the best evidence of a likelihood of confusion.'" *Elvis Presley Enters.,* 141 F.3d at 203 (quoting *Amstar,* 615 F.2d at 263). "Actual confusion that is later dissipated by further inspection of the goods, services, or premises, as well as post-sale confusion, is relevant to a determination of a likelihood of confusion. 'Infringement can be based on confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion.'" *Id.* at 204 (citation omitted) (quoting 3 McCarthy, *supra,* §§ 23:6–:7).

Quantum Fitness documented instances of actual confusion. Several fitness clubs that are customers of Quantum Fitness operate in close proximity to the Quantum LifeStyle facility, including the Cypress Creek YMCA, the Lake Houston YMCA, and the Lake Houston Gym & Fitness club. Ayton and Croegaert testified that employees of these clubs telephoned Quantum Fitness to ask whether Quantum LifeStyle was affiliated with, or sponsored by, Quantum Fitness. This testimony is corroborated by telephone records kept by Quantum Fitness. (P.Ex. 1). Ayton and Croegaert testified that the employees of these facilities, which compete with Quantum LifeStyle, expressed concern about the possibility that Quantum Fitness was opening a health club in their vicinity, especially because a Quantum Fitness club would have access to better equipment at lower prices.

Quantum Fitness also produced other evidence of actual confusion. Some callers telephoned Quantum Fitness attempting to reach individuals who worked at Quantum LifeStyle, believing the companies to be identical. (P. Exs. 1, 6, 8, 9i). Quantum Fitness documented other calls that it received that were obviously intended to reach Quantum LifeStyle: one caller asked about the availability of day care, (P.Ex. 1); another caller asked for directions to make a delivery to "Quantum Fitness in Kingwood," [15] (P.Ex. 4); a third caller asked if the "club" was opening soon. (P.Ex. 5). Other callers made general inquiries about Quantum LifeStyle. (P. Exs. 2, 3, 4, 7).

Quantum Fitness demonstrated one other instance of actual confusion through the testimony of John Ramirez, a fitness specialist for the City of Missouri City Parks and Recreations Department. Ramirez testified that he called the office manager of the Northwest YMCA, where Ramirez

---

**15.** Kingwood is a suburb of Houston that is close to the town of Humble, where Quantum LifeStyle's facility is located.

had previously worked, to tell her about an event he was planning. The office manager then asked Ramirez if he had heard that Lisa D'Angelo, another Northwest YMCA employee, had taken a job to work for "Quantum Fitness" at its new facility in Kingwood. Ramirez was surprised at the news of Quantum Fitness's apparent entry into the health club market. He subsequently learned that the facility had no affiliation with Quantum Fitness.[16]

█ Quantum LifeStyle asserts that all Quantum Fitness's evidence of actual confusion is inadmissible hearsay. This court admitted this evidence not for the truth of the matters asserted, but to demonstrate that the statements were made. This court's evidentiary ruling is supported by Fifth Circuit precedent. In *Armco*, the Fifth Circuit upheld the trial court's finding of trademark infringement in part because of the evidence of actual confusion elicited at trial. *See* 693 F.2d at 1160. An employee of Armco, the plaintiff, testified that "he had received phone calls at least once a month from people trying to reach" the defendant, Armco Burglar Alarm. *Id.* The employee also testified that several of his acquaintances asked him when his company had expanded into the burglar alarm business. Other Armco employees reported fielding telephone calls from people trying to reach Armco Burglar Alarm. The Fifth Circuit rejected the defendant's argument that this testimony was inadmissible hearsay, because "the testimony about phone calls and conversations was not being offered to show that Armco and Armco Burglar Alarm were the same business, but to show that people thought they were." *Id.* at 1160 n. 10. The Fifth Circuit also stated that the evidence was also admissible under the state of mind exception

the hearsay rule. *See id.* Other courts have considered similar evidence in finding actual confusion. *See, e.g., Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003–04 (2d Cir.1997); *Tools USA & Equip. Co. v. Champ Frame Straightening Equip.*, 87 F.3d 654, 661 (4th Cir.1996); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir.1988); *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 9 F.Supp.2d 1347, 1360–61 (S.D.Fla.1998) (citing cases).[17]

This court finds that Quantum Fitness has submitted competent evidence of actual confusion.

### 3. Weighing the Digits of Confusion

█ Several of the digits militate against a finding of trademark infringement. Quantum Fitness's marks are relatively weak outside the fitness industry. The parties' lines of business are distinct; Quantum LifeStyle primarily provides services to end users, while Quantum Fitness provides goods to intermediary commercial entities, a difference reflected in the advertising and marketing efforts.

These digits are overridden by the strength of the Quantum marks within the fitness industry, the complementary nature of the parties' products and services, the dominance of the arbitrary term "Quantum" in the parties' respective marks, the danger of confusion based on perceived sponsorship or affiliation between the parties, and the evidence of actual confusion. This court finds that Quantum Fitness has demonstrated a substantial likelihood of success on the merits.

█ This court's finding is bolstered by the fact that when the "likelihood of

---

**16.** Quantum LifeStyle attempted to impeach Ramirez's testimony by presenting evidence that D'Angelo was responsible for terminating Ramirez's employment at the YMCA, and that she only once mentioned her plans to join Quantum LifeStyle while still working at the Northwest YMCA. This court found Ramirez to be a credible witness.

**17.** Some courts in other jurisdictions have found similar evidence to be inadmissible hearsay. *See, e.g., Duluth News–Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir.1996); *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F.Supp. 37, 41–42 (D.Mass.1995); *Alchemy II, Inc. v. Yes! Entertainment Corp.*, 844 F.Supp. 560, 570 n. 12 (C.D.Cal.1994).

confusion" analysis is closely balanced, the question should be resolved in favor of the senior user. *See Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 n. 14 (9th Cir.1997); *American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir.1978); *Waples–Platter Cos. v. General Foods Corp.*, 439 F.Supp. 551, 575 (N.D.Tex.1977); *see also* 3 McCarthy, *supra*, § 23:64, at 23–146 ("The burden of proof is always on the plaintiff but when the evidence is weighed and the scales balance equally, the doubt is resolved in favor of the party who has built up valuable rights in the mark.").

### B.  Irreparable Injury

A plaintiff must also show an "irreparable injury" in order to obtain a preliminary injunction. When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services. *See Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F.Supp. 1387, 1394 (S.D.Tex.1989); *Chemlawn Servs. Corp. v. GNC Pumps, Inc.*, 690 F.Supp. 1560, 1569 (S.D.Tex. 1988); *Pro Hardware, Inc. v. Home Ctrs. of America, Inc.*, 607 F.Supp. 146, 154 (S.D.Tex.1984). An injury is also irreparable when compensatory damages are extremely difficult to calculate. *See Chemlawn Servs.*, 690 F.Supp. at 1569; *Pro Hardware*, 607 F.Supp. at 154.

Quantum LifeStyle's continued use the "Quantum" mark is likely to lead Quantum Fitness's commercial purchasers to believe that Quantum Fitness is, or will be, directly competing in the fitness club market. Commercial purchasers will not continue to purchase from Quantum Fitness if they believe Quantum Fitness is, or will be, in direct competition.

Quantum Fitness will also inevitably be injured if individuals use the Quantum LifeStyle facility as a result of confusion between the Quantum LifeStyle and Quantum Fitness marks. If these individuals are impressed by Quantum LifeStyle and decide to become members, they will be exposed to, and may prefer, the other brands of exercise equipment offered by Quantum LifeStyle. Quantum LifeStyle might draw away people who belong to other health clubs in the vicinity that are clients of Quantum Fitness, diminishing their attachment to Quantum Fitness's products. If Quantum LifeStyle makes a bad impression, Quantum Fitness asserts that its own reputation and goodwill will be harmed as a result of confusion with Quantum LifeStyle.

This court finds that Quantum Fitness lacks control over how the "Quantum" mark is being used by Quantum LifeStyle and that Quantum Fitness's potential pecuniary injuries are both unquantifiable and undiscoverable. Accordingly, Quantum Fitness has met its burden of demonstrating irreparable harm.

### C.  The Threatened Injury Outweighs any Damage that the Injunction Will Cause the Opposing Party

The third requirement for obtaining a preliminary injunction "requires the plaintiff to establish that his irreparable harm is greater than the hardship that the preliminary injunction would cause the defendant." *Acme Refrigeration Supplies, Inc. v. Acme Refrigeration of Baton Rouge, Inc.*, 961 F.Supp. 936, 939 (E.D.La.1996). Bauer testified that as a startup company, Quantum LifeStyle is in a precarious financial position. Bauer asserted that an injunction requiring Quantum LifeStyle to change its mark would "rock the boat," potentially causing Quantum LifeStyle to lose millions of dollars and its "entire marketing budget." According to Bauer, a name change would lead customers to believe that Quantum LifeStyle faced financial or legal troubles. He testified that customers have already inquired about the disclaimers Quantum LifeStyle has agreed to use in its promotional materials, while Quantum Fitness's preliminary injunction motion was pending.

Bauer's testimony was not persuasive. Quantum LifeStyle's general manager, Lisa D'Angelo, testified that the defendant has been using the "QLS" mark alone, rather than the "QLS QuantumLifeStyle Center" mark, since this court's December 31 temporary restraining order. D'Angelo testified that using the "QLS" mark alone has "not [been] a problem."

In addition, Quantum LifeStyle spent only modest sums in advertising and promoting itself through the "QLS Quantum-LifeStyle Center" mark. Bauer testified that had spent only $20,000 for marketing expenses as of mid-January 1999. Bauer conceded that it would be inexpensive for a design firm to remove the term "quantum" from Quantum LifeStyle's mark. He also conceded that the costs of changing Quantum LifeStyle's signage and replacing other items bearing the "QLS QuantumLifeStyle Center" mark would not be significant.[18] This court also observes that many of Quantum LifeStyle's marketing and advertising costs were expended after Bauer was notified of Quantum Fitness's trademark grievances. Bauer chose to incur these costs in the face of a possible infringement claim, a fact that undercuts Quantum LifeStyle's claim of hardship.

### D. Public Interest

The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks. *See Acme Refrigeration Supplies,* 961 F.Supp. at 941. *Chemlawn Servs.,* 690 F.Supp. at 1572; *Pro Hardware,* 607 F.Supp. at 155. Protecting Quantum Fitness's valid trademark from infringement by a junior user does not disserve the public interest.

### III. Conclusions of Law

Quantum Fitness's marks are arbitrary and are entitled to protection under the Lanham Act. Quantum LifeStyle's continued use of its mark is likely to cause confusion in the marketplace. This conclusion is supported by the strength of the Quantum marks within the fitness industry, the complementary nature of the parties' products and services, the dominance of the arbitrary term "Quantum" in the parties' respective marks, the danger of confusion based on perceived sponsorship or affiliation between the parties, and the evidence of actual confusion. Accordingly, Quantum Fitness has demonstrated a substantial likelihood of success on the merits on its trademark infringement claim.

Quantum Fitness has also demonstrated that it will be irreparably injured if Quantum LifeStyle continues to use the "Quantum" mark. This court concludes that any irreparable harm suffered by Quantum Fitness would outweigh any hardship that a preliminary injunction would cause Quantum LifeStyle. This court also concludes that protecting Quantum Fitness's valid trademark from infringement is in the public interest.

Because Quantum Fitness has satisfied all four requirements of a preliminary injunction, this court GRANTS Quantum Fitness's motion for a preliminary injunction.

### IV. Order

This court ORDERS as follows:

- Defendant shall not use the word "Quantum" as part of its name or mark, or to refer to the name of its facility or business, including, but not limited to, the following uses and references: its signage; advertisements; mailings; solicitations; letterhead; telephone, email, or Internet web page listings; contracts; and logo or insignia clothing, towels, utensils, or other

---

**18.** Bauer testified that aside from a few test shirts, all the sports clothing he ordered used only the "QLS" logo. Bauer also testified that he had stored letterhead, business cards, and extra mailers that included the term "Quantum" pending the outcome of this litigation. However, Quantum Fitness's attorney impeached him on this point, noting that Bauer had testified at an earlier deposition that he had destroyed all these items.

similar items used inside or outside the club.

- Until the time of the hearing on plaintiff's motion for permanent injunction, plaintiff and its principals, agents, employees, representatives, and attorneys shall have permission to perform unannounced visits to, and inspections of, the premises of defendant's facility in order to verify compliance with this order at reasonable intervals during regular business hours.

- This order is binding upon defendant, its principals, agents, employees, representatives, and attorneys and those in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

- This order shall remain in effect pending the hearing and resolution of plaintiff's motion for permanent injunction.

The court will hold a permanent injunction hearing beginning on September 21, 1999 at 9:00 a.m.